IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE, | |
| Plaintiff, | **8:19-CV-252** |
| vs. | |
| SCOTT FRAKES, Director of the Department of Corrections, in his individual and official capacity; BRIAN GAGE, former Warden of the Tecumseh State Correctional Institute, in his individual capacity; DIANE J. SABATKA-RINE, former Deputy Director of Institutions, now Chief of Operations, in her individual capacity; CHRISTOPHER ULRICH, former Sergeant at Department of Corrections, was Acting Lieutenant of Tecumseh State Correctional Institute, in his individual capacity; CRYSTAL REMPEL, former Corporal at Department of Corrections, was Acting Yard Supervisor of Tecumseh State Correctional Institute, in her individual capacity; LUCAS ROEDE, former Corrections Officer at Department of Corrections Tecumseh State Correctional Institute, in his individual capacity; SARAH GLASS, former Unit Case Worker at Department of Corrections, Tecumseh State Correctional Institute, in her individual capacity; and SONNY STEELE, former Unit Case Worker at Department of Corrections, Tecumseh State Correctional Institute, in his individual capacity; | **MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

1

## I.    INTRODUCTION

Plaintiff, a former inmate at Tecumseh State Correctional Institute (TSCI), has brought a failure-to-protect claim against Defendants under the Eighth and Fourteenth Amendments. Filing 98. While incarcerated at TSCI, Plaintiff claims that several inmates sexually assaulted her during a prison riot on May 10, 2015. In general, Plaintiff's claims are based on purported staffing issues at TSCI and the insufficiency of Defendants' response to the TSCI riot. Plaintiff contends that Defendants abandoned her and other inmates during the riot, despite knowing that she was at risk of being assaulted.

Before the Court is Defendants' Motion for Summary Judgment, which argues that Defendants did not violate Plaintiff's constitutional rights and that they are entitled to qualified immunity. Filing 146. According to Defendants, TSCI had sufficient staff on the day of the riot and Defendants acted consistent with prison policy while responding to the riot. For the reasons stated herein, the Court grants Defendants' Motion and denies as moot Defendants' pending Motion in Limine, Filing 163, and Plaintiff's pending Motion to Strike, Filing 176.

## II.    BACKGROUND[1]

This case arises from events leading up to and during a riot at TSCI, a state prison housing medium- and maximum-security inmates and death-row inmates. Filing 148-11 at 1. Plaintiff Jane Doe is a transgender (male to female) individual who was an inmate at TSCI during the riot. Filing 98 at 2, 4. Plaintiff's inmate classification form states that she is at risk of being victimized while at prison. Filing 152-2 at 3, 6. Several of the Defendants were employees of the Nebraska Department of Correctional Services who were at TSCI on the day of the riot. The other

---

[1] Plaintiff failed to offer responses to a few statements of fact in Defendants' Brief in Support of their Motion for Summary Judgment. Accordingly, the Court deems those statement of facts true to the extent they are supported by the record. *See* NECivR 56.1(b)(1) ("Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.")

Defendants are Scott Frakes, the Director of the Nebraska Department of Correctional Services, Filing 148-2 at 6, and Diane Sabatka-Rine, the former Deputy Director of Institutions for the Nebraska Department of Correctional Services. Filing 148-16 at 1.

TSCI is divided into four separate housing units. Filing 148-11 at 1. Housing Unit 2 is divided into four sections called "galleries." Filing 148-10 at 2. Housing Unit 2 has two control stations, one of which serves Galleries A and B. Filing 148-10 at 2. From the control station, correctional officers can monitor their sector, unlock cells, and communicate with TSCI central control. Filing 148-10 at 2. At the time of the riot, Plaintiff resided in Gallery A of Housing Unit 2. Filing 98 at 5.

On May 10, 2015, the total number of staff on duty at TSCI was 57 and the total number of inmates was 1,024. Filing 148-11 at 2. Ordinarily, the minimum staffing requirement at TSCI is 61 staff members. Filing 148-10 at 3; Filing 148-11 at 2. However, Defendants highlight that on May 10 two areas of the prison were closed, which reduced the required number of staff to 57. Filing 148-11 at 2. In contrast, Plaintiff points to the May 10 work roster and TSCI's post orders to argue that certain areas of TSCI were understaffed. Filing 151-6 at 1; Filing 153 at 17. Specifically, Plaintiff believes that the work roster and post orders show that Housing Unit 2 was missing two Unit Case Managers and two Unit Caseworkers.[2] Filing 151-6 at 1; Filing 153 at 17. An investigation conducted by a Washington state prison administrator after the riot did not

---

[2] Plaintiff arrives at this conclusion by pointing to the post orders governing TSCI's Housing Units. Filing 152-7 at 5. The post orders state that Housing Unit 2 "maintains" four Unit Case Managers and a minimum of four Unit Caseworkers. Filing 152-7 at 5. Plaintiff then highlights that the May 10 work roster shows that there were not four Unit Case Mangers and four Unit Case Workers on May 10. However, Plaintiff's reliance on the Post Orders is misplaced because nothing in the Post Orders mandates that specific levels of staff be present at any given time.

conclude that TSCI was understaffed on May 10, although it did find that TSCI staff experienced a high turnover rate and had low morale.[3] Filing 151-4 at 7–8, 11; Filing 151-5 at 6, 31–32.

Defendant Crystal Rempel, a sergeant at TSCI, was the yard supervisor and medical lines corporal on May 10, 2015. Filing 148-6 at 1, 4; Filing 148-15 at 6. As the yard supervisor and medical lines corporal, Rempel supervised staff members in the yard and determined when to release inmates to the medical lines so that inmates could obtain medication. Filing 148-15 at 7–8. Sometime around 2:30 p.m., Rempel ordered Housing Units 1, 2, and 3 to release inmates to go to the medical lines. Filing 148-15 at 7–8; Filing 151-5 at 17. No policy at TSCI governed how to conduct releasing inmates to the medical lines, and TSCI staff did not screen inmates before releasing them to ensure that the inmates had approval to go the medical lines. Filing 151-5 at 17. As the inmates began arriving on the yard to report to the medical lines, Rempel noticed that there were several inmates who were not supposed to be on the yard. Filing 148-15 at 8. A large group of inmates then began gathering on the yard and refused to comply with dispersal orders. Filing 151-5 at 9. Defendant Sarah Glass, a caseworker stationed at Galleries A and B, entered the yard and attempted to help disperse the gathering of inmates to no avail. Filing 148-15 at 9; Filing 151-5 at 9; Filing 151-6 at 1. Rempel then radioed available staff to come to the yard to assist her. Filing 148-15 at 8–9.

Two corrections officers responded to Rempel's call and approached one of the inmates who was not supposed to be on the yard. Filing 148-15 at 8–10. As they were speaking to that inmate, another inmate punched one of the corrections officers. Filing 148-15 at 10. A few inmates

---

[3] Plaintiff also points to a group grievance statements from TSCI staff in 2004 to show that TSCI had staffing issues. Filing 152-4 at 1–5. However, as Defendants point out, TSCI staff presented this grievance 11 years before the riot, which took place in 2015. Moreover, the grievance does state that TSCI was maintaining minimum staffing requirements. *See* Filing 152-4 at 1 ("We want full staffing rather than minimum staffing on all units and shifts.").

joined in the scuffle. Filing 148-15 at 10–11. Rempel immediately called for assistance from the Emergency Response Team at TSCI. Filing 148-15 at 10–11.

In response to the group of inmates becoming violent, a corrections officer fired a warning shot while Rempel ordered all inmates to get on the ground. Filing 148-15 at 10–11; Filing 151-5 at 9. The inmates initially complied with this order. Filing 148-15 at 11. At around this time, defendant Sonny Steele, a case worker stationed at the control center between Galleries A and B of Housing Unit 2, arrived to assist Rempel. Filing 148-7 at 4; Filing 148-17 at 3; Filing 151-6 at 1; Filing 151-5 at 9. While the inmates were on the ground, TSCI corrections officers were able to restrain some of the inmates involved in the assault on TSCI staff. Filing 148-15 at 11. Due to the violent altercation on the prison yard, at 2:49 p.m. defendant Christopher Ulrick,[4] the Acting Lieutenant at TSCI and the Shift Supervisor, ordered all housing units to lock down. Filing 148-9 at 50; Filing 151-5 at 10; Filing 151-7 at 44. When he heard Ulrick's command to lock the housing units down, Steele returned to his post at the control center between Galleries A and B to help lock the inmates down. Filing 148-7 at 4.

While the corrections officers escorted the restrained inmates involved in assaulting TSCI staff to holding cells, Rempel ordered all inmates to return to their housing units. Filing 148-15 at 11. However, the inmates refused to comply. Filing 148-15 at 13. Instead, a large group of inmates charged at Rempel and the remaining corrections officers, forcing them to flee into TSCI's medical clinic. Filing 148-15 at 14. Once Rempel entered the medical clinic, she radioed all TSCI staff to get to safety. Filing 148-15 at 15. Rempel then received a call from a female corrections officer stating that she was trapped in the gym and that inmates were asking her to open the gym door. Filing 148-15 at 18.

---

[4] The case caption incorrectly shows defendant Ulrick's name as "Ulrich." *See* Filing 151-6 at 1 (showing correct spelling of defendant Ulrick's name).

Due to the escalating situation, TSCI Warden defendant Gage, a Crisis Negotiation Team, a Corrections Emergency Response Team (CERT), and a Special Operations Response Team (SORT) were contacted at around 3:00 p.m. to report to TSCI. Filing 148-3 at 4; Filing 148-11 at 2–3; Filing 148-13 at 11; Filing 148-14 at 15; Filing 151-7 at 71 (call log showing defendant Ulrick requesting assistance from CERT, SORT, and the Crisis Negotiation Team at 3:08 p.m.). Defendant Ulrick then assumed the role of Initial Incident Commander. Filing 148-9 at 50; Filing 148-11 at 2; Filing 148-14 at 11. Ulrick remained in this role once Warden Gage arrived at around 5:15 p.m., and later turned control over to Warden Gage at around 8:20 p.m.[5] Filing 151-2 at 450–51; Filing 151-3 at 1–2.

Defendant Lucas Roede, a corrections officer at TSCI, was stationed at the control center for Galleries A and B in Housing Unit 2 when her heard Ulrick's command at 2:49 p.m. to lock down. Filing 148-5 at 4. Roede and Steele, who had returned from the yard, attempted to get the inmates in Galleries A and B to lock down, but many of the inmates in Gallery A, in which Plaintiff resided, refused. Filing 148-9 at 59. Instead, the inmates in Gallery A began to cover the windows of the control center with sheets, plaster wet toilet paper on security cameras, and fashion weapons out of broom handles, ironing board legs, and other items. Filing 148-9 at 59; Filing 148-12 at 3. Inmates began using their makeshift weapons to break down the wall separating Galleries A and B—which ultimately created a passage through the wall—and set the internal part of the wall on fire. Filing 148-9 at 59, 74–75; Filing 148-17 at 1–2; Filing 148-12 at 2. Eventually, Roede and Steele informed Ulrick that they were under duress. Filing 148-12 at 2–3. Ulrick authorized them to evacuate to the control center for Galleries C and D, and once the smoke from the fire became too thick in Galleries C and D, they moved to the caseworker office. Filing 148-9 at 62; Filing

---

[5] Delaying transfer of control to Warden Gage was consistent with TSCI emergency policy. Filing 157-2 at 8.

148-12 at 2–3. Roede, Steele, and other corrections officers barricaded the caseworker office's door with furniture to prevent any rioting inmates from entering. Filing 148-10 at 5.

Because of the fire, Ulrick authorized releasing the inmates in Galleries A and B from their cells to evacuate. Filing 148-9 at 66–68; Filing 148-10 at 3; Filing 148-14 at 14, 16. Thereafter, the cell doors in Galleries A and B were remotely unlocked to allow inmates to exit. Filing 148-9 at 66–68; Filing 148-10 at 3. An announcement over TSCI's public address system informed inmates to evacuate to the exterior miniyards. Filing 148-10 at 3. Ordinarily, TSCI policy dictates that inmates and staff evacuate in a safe and controlled manner during a fire using pre-determined routes. Filing 152-7 at 42–43, 72. However, given the ongoing inmate disturbance, staff had already evacuated Galleries A and B, leaving the inmates to evacuate themselves. While Plaintiff argues that the staff leaving before the inmates was a violation of TSCI policy, TSCI policy does provide for immediate staff evacuation if life safety is an issue. Filing 152-7 at 42, 70.

Before the arrival of the CERT and SORT teams, there were numerous unsecured inmates—some armed with makeshift weapons—on the main yard, smoke was billowing throughout Housing Unit 2, and several staff members, who were barricaded in different areas of the prison to protect themselves from rioting inmates, required rescue. Filing 148-10 at 4–5; Filing 148-11 at 2–3; Filing 148-17 at 1–2; Filing 151-5 at 11–12. By 4:21 p.m., members of the CERT and SORT response teams had arrived on the prison yard to prepare to rescue one of the corrections officers trapped in TSCI's gym. Filing 148-14 at 15. The CERT and SORT teams were successful in rescuing the corrections officer. Filing 148-14 at 16; Filing 148-15 at 21. TSCI corrections officers and the CERT and SORT teams continued rescuing trapped prison staff and underwent an hours-long process to retake the facility. Filing 148-10 at 5; Filing 148-11 at 2; Filing 151-5 at 15–16. TSCI corrections officers and the CERT and SORT teams did not regain control of TSCI until

sometime between 12:00 midnight and 1:00 a.m. on May 11, 2015.[6] Filing 151-2 at 293 (Defendant Frakes testifying that "around midnight" prison staff had regained control of TSCI); Filing 151-5 at 11, 16 (post-incident report stating that prison staff regained control of TSCI at 1:00 a.m.).

Plaintiff claims that she was sexually assaulted during the riot. Filing 152-11 at 2–4. At around 2:45 p.m. on May 10, 2015, Plaintiff awoke in her cell in Gallery A of Housing Unit 2 and discovered that smoke was flowing into her cell. Filing 152-11 at 1. After exiting her cell, Plaintiff proceeded to the miniyard outside of Gallery A. Filing 152-11 at 2. Plaintiff estimates that around 5:30 p.m. she returned to Gallery A to use the restroom. Filing 152-11 at 2. While walking back, Plaintiff states that an inmate hit her on the head and dragged her through the hole inmates had smashed in the wall separating Galleries A and B. Filing 152-11 at 2. Plaintiff claims that she was then sexually assaulted by several inmates. Filing 152-11 at 2–3. Although Plaintiff did not mention the assault during a post-riot interview, Plaintiff explains that she was afraid of retaliation if she reported what had happened to her.[7] Filing 148-17 at 5–7; Filing 152-11 at 3–4. After the riot, Plaintiff was transferred to a different prison and no longer resides at TSCI. Filing 152-11 at 4.

On May 10, 2019, Plaintiff filed suit against Defendants, which Defendants removed to this Court on July 13, 2019. Filing 1-1 at 1–21. In her Amended Complaint, Plaintiff brings a failure-to-protect claim against Defendants in their individual capacity and defendant Frakes in his

---

[6] Plaintiff attempts to cast doubt on how long it took prison staff to regain control of TSCI by pointing to a part of defendant Gage's deposition in which he testified that the main yard appeared "vacant" after he arrived at TSCI at around 5:15 p.m. Filing 148-13 at 13; Filing 151-3 at 2. However, Gage also testified that when he arrived prison staff did not have control over the gym, Housing Unit 2, and Housing Unit 3. Filing 148-13 at 13. Thus, there is no genuine dispute over whether TSCI was under control when Gage arrived, rather than between 12:00 midnight or 1:00 a.m. on May 11.

[7] In her Brief in Opposition, Plaintiff asserts that "inmates were not evacuated until 8:12 in the morning." Filing 153 at 41. Plaintiff does not cite any evidence in support of this assertion, however.

official capacity. Filing 98 at 2–4. On March 14, 2022, Defendants filed their Motion for Summary

Judgment. Filing 146.

### III.   ANALYSIS

### A.  Standard of Review

"Summary judgment is appropriate when the evidence, viewed in the light most favorable

to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled

to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881,

884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is not disfavored and is

designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012)

(internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043

(8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the

record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in

that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v.

Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the

burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment

motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except* the

mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011)

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce

evidence showing "an absence of a genuine issue of material fact." *Johnson v. Wheeling Mach.

Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (citing *Celotex*, 477 U.S. at 323). Instead, "the burden

on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to

support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596

(8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

9

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than 'the mere existence of *some* alleged factual dispute'" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

### B.  The Claim Against Frakes in his Official Capacity

Plaintiff's claim against Frakes, the Director of the Nebraska Department of Correctional Services, in his official capacity requests an injunction requiring him to "provide correctional facilities which comply with nationally mandated standards regarding capacity." Filing 98 at 13. A suit against a state official in his or her official capacity constitutes a suit against the State itself. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016) ("[C]laims against state officials in their official capacities are really suits against the state . . . ."); *see also Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) ("The real party in interest [in an official-capacity suit] is the government entity, not the named official."). Thus, a suit for damages under 42 U.S.C. § 1983 against a state official in his or her official capacity is barred by sovereign immunity. *See Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017) ("A suit for damages against a state official in his official capacity is a suit against the State, and the State is not a person under § 1983."). However, a suit against a state official in his or her official capacity

10

for declaratory or injunctive relief is permissible, "because those claims are treated as an action against the official personally and not against the State." *Id.*

As to her request that TSCI "comply with nationally mandated standards regarding capacity," Plaintiff's claim for injunctive relief against Frakes in his official capacity is moot. "[A]n action seeking an injunction to alter prison conditions becomes moot once the plaintiff transfers to another facility." *Brazil v. Arkansas Dep't of Hum. Servs.*, 892 F.3d 957, 960 (8th Cir. 2018); *see also Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012) ("Because [the plaintiff] is no longer subject to the policies that he challenges, there is no live case or controversy."). "It makes no difference that it is theoretically possible that the plaintiff could return to the original facility and once again face the same conditions." *Brazil*, 892 F.3d at 960. Despite Defendants failing to raise the issue of mootness in their brief supporting summary judgment, the Court may consider mootness *sua sponte*. *See Bierman v. Dayton*, 817 F.3d 1070, 1072 (8th Cir. 2016) ("As mootness relates to justiciability and our power to hear a case, we must consider it even [if] the parties have not raised it." (internal quotation marks omitted) (alteration in original) (quoting *Bacon v. Neer*, 631 F.3d 875, 877 (8th Cir. 2011)). Here, Plaintiff admits that she no longer resides at TSCI. Filing 98 at 3; Filing 152-11 at 4. Thus, her request regarding the staffing levels at TSCI is moot and must be dismissed without prejudice. *See Hawse v. Page*, 7 F.4th 685, 694 (8th Cir. 2021) (affirming district court dismissing moot claims without prejudice).

Plaintiff's injunctive relief request, however, concerns the entire Nebraska prison system, not just TSCI. Plaintiff currently resides in a Nebraska prison. Filing 98 at 2. Frakes in his official capacity, as the Director of the Nebraska Department of Correctional Services, has the power to address the staffing levels of any prison in Nebraska. Thus, as it relates to her current prison, Plaintiff's request for injunctive relief is not moot. *See Randolph v. Rodgers*, 170 F.3d 850, 856–

57 (8th Cir. 1999) (holding that a transfer to a different facility did not render moot the plaintiff's claim for injunctive relief when the defendant controlled the prison to which the plaintiff was transferred). Nevertheless, Plaintiff's claim for injunctive relief still fails. To succeed on her conditions-of-confinement claim related to understaffing at her current prison, Plaintiff must "show that the alleged deprivation, viewed objectively, is 'sufficiently serious' and that the prison officials' actions, viewed subjectively, demonstrate a 'deliberate indifference' to the prisoner's health or safety." *Rahman X v. Morgan*, 300 F.3d 970, 974 (8th Cir. 2002) (quoting *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998)). Plaintiff has presented no evidence concerning the staffing levels at her current prison. Without any evidence to support her claim, no reasonable jury could find in her favor. *See Dryer v. Nat'l Football League*, 814 F.3d 938, 942 (8th Cir. 2016) ("A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial."). Thus, Frakes in his official capacity is entitled to summary judgment.

### C.  The Claims Against Rempel, Roede, Glass, and Steele

Plaintiff's failure-to-protect claim against defendants Rempel, Roede, Glass, and Steele accuses them of violating prison policy, failing to respond to the prison riot appropriately, and abandoning inmates rather than attempting to quell the riot. Filing 153 at 66–68. Rempel, Roede, Glass, and Steele assert that they did not violate Plaintiff's Eighth Amendment rights, because they responded appropriately to the prison riot and their actions were not contrary to TSCI's policies. Filing 147 at 29–31.

"The Eighth Amendment 'prohibits the infliction of cruel and unusual punishments on those convicted of crimes.'" *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991)). "Prison officials have a duty to protect

prisoners from violence at the hands of other prisoners." *Chavero-Linares v. Smith*, 782 F.3d 1038, 1041 (8th Cir. 2015) (quoting *Holden v. Hirner*, 663 F.3d 336, 340–41 (8th Cir. 2011)). Thus, prison officials must "'take reasonable measures to guarantee' inmate safety . . . ." *Nelson v. Shuffman*, 603 F.3d 439, 446 (8th Cir. 2010) (quoting *Young v. Selk*, 508 F.3d 868, 871–72 (8th Cir. 2007)).

"A prison official 'violates the Eighth Amendment if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates.'" *Vandevender v. Sass*, 970 F.3d 972, 975 (8th Cir. 2020) (quoting *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998)). "This claim has an objective component, whether there was a substantial risk of serious harm to the inmate, and a subjective component, whether the prison official was deliberately indifferent to that risk." *Id.* (citing *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000)). "As prisons are inherently dangerous environments, '[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

The parties focus their arguments on whether Defendants were deliberately indifferent. "The deliberate indifference element is subjective and has two components." *Blair v. Bowersox*, 929 F.3d 981, 987 (8th Cir. 2019). Plaintiff must first show that a defendant "knew of the substantial risk of serious harm to [Plaintiff]." *Id.* (quoting *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015)). Proof of actual knowledge of the risk is not required if "the risk was obvious enough to support the inference that [the defendant] knew the risk existed." *Id.* However, the plaintiff must still show that the defendant "had been exposed to information concerning the risk and thus 'must have known' about it." *Id.* (quoting *Letterman*, 789 F.3d at 862).

13

If the plaintiff is able to show a defendant's knowledge of the risk, the plaintiff must then prove that the defendant "deliberately disregarded that risk." *Id.* This requires a showing that the defendant "knew that [his] conduct was inappropriate in light of the risk." *Id.* (alteration in original) (quoting *Letterman*, 789 F.3d at 862). In contrast to negligence, or even gross negligence, this standard is similar to criminal recklessness, requiring that the defendant be "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference' before acting—or failing to act—with a conscious disregard for the risk." *Id.* at 987–88 (quoting *Farmer*, 511 U.S. at 837); *see also Fourte v. Faulkner Cnty., Ark.*, 746 F.3d 384, 390 (8th Cir. 2014) ("[D]eliberate indifference is 'more even than gross negligence.'" (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)).

The Court begins with Plaintiff's claims against Rempel, the Yard Supervisor who released the inmates to the medical lines on the day of the riot. The record shows that Rempel ordered the housing units to release the inmates authorized to go to the medical lines at around 2:30 p.m. Filing 148-15 at 7–8. Plaintiff points out that TSCI's post orders have a daily schedule stating that inmates are to be released for medical lines at approximately 12:00 noon., Filing 152-7 at 7, although Plaintiff does not explain why that fact is significant. At around 2:41 p.m., someone claiming to be the yard supervisor made a short personal phone call. Filing 151-7 at 68. At around this time, Rempel noticed that several inmates were not supposed to be on the yard, and a large group of inmates refused to comply with dispersal orders. Filing 148-15 at 8; Filing 151-5 at 9. Rempel radioed for assistance and, after the inmates began assaulting corrections officers, radioed for the Emergency Response Team. Filing 148-15 at 8–11; Filing 151-7 at 44. Ultimately, while Rempel was attempting to get the inmates in the yard back to their housing units, a large group of inmates charged at her, forcing her to flee into the medical clinic. Filing 148-15 at 13–14.

14

According to Plaintiff, Rempel exhibited deliberate indifference to a substantial risk of serious harm to Plaintiff in the way that Rempel handled releasing inmates to the med lines. Filing 153 at 65–66. Plaintiff argues that Rempel was "inattentive" because she made a personal phone call during her shift and violated TSCI's post orders by calling inmates to the medical lines late. Filing 153 at 66–67. Defendants respond that Rempel was not deliberately indifferent because she had never had issues in the past releasing inmates to report to medical lines and that she responded reasonably when she spotted several inmates that were not supposed to be on the yard. Filing 147 at 29; Filing 159 at 29–31.

The Court concludes that Plaintiff has not provided sufficient evidence from which a reasonable jury could find that Rempel was deliberately indifferent. Plaintiff gives no explanation as to how Rempel releasing the medical lines late displays any deliberate indifference to a substantial risk of serious harm to Plaintiff. In fact, there is no evidence that releasing the medical lines late shares any connection with the riot and Plaintiff's assault. *See Schuab v. VonWald*, 638 F.3d 905, 921 (8th Cir. 2011) (explaining, in the context of a § 1983 action, "[W]here the causal link is so tenuous as to justify taking it from the trier of fact, a court may decide the issue as a matter of law.")  Moreover, Rempel supposedly making a personal phone call after releasing inmates may show inattentiveness, as Plaintiff argues, but inattention is not the same as deliberate indifference. *See Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017) ("This court has repeatedly held mere negligence or inadvertence does not rise to the level of deliberate indifference."). Finally, Plaintiff makes no argument that Rempel's response to unauthorized inmates being on the yard was deliberately indifferent, and the Court finds no evidence that Rempel responded inappropriately. Accordingly, Rempel is entitled to summary judgment.

The Court next addresses Plaintiff's claim against Roede, the corrections officer stationed at the control center for Galleries A and B. Plaintiff argues that Roede was deliberately indifferent because he released prisoners to report to medical lines without verifying that each prisoner exiting Galleries A and B was authorized to leave. Filing 153 at 65–67. Nothing in the record shows that TSCI policy required Roede to screen prisoners before releasing them to report to medical lines, however.[8] Instead, the evidence shows that TSCI used an honor system rather than screening inmates, and that Roede typically ordered inmates through the prison intercom to report to medical lines and then opened the door to the prison yard. Filing 148-9 at 37–39, 42–44; Filing 151-2 at 327–28. Plaintiff has not pointed to any evidence showing that Roede was aware that his typical practice of calling for prisoners to report to the medical lines and opening the door to the yard could cause a prison riot. See Kulkay, 847 F.3d at 643 ("An official is deliberately indifferent if he or she actually knows of the substantial risk . . . ." (quoting Young, 508 F.3d at 873)). Indeed, Plaintiff has not offered any evidence that Roede did anything that caused the riot. See Z.J. by & through Jones v. Kansas City Bd. of Police Commissioners, 931 F.3d 672, 688 (8th Cir. 2019) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." (quoting Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007))); see also Schuab, 638 F.3d at 921 ("[W]here the causal link is so tenuous as to justify taking it from the trier of fact, a court may decide the issue as a matter of law."). Nothing in the record suggests that any of the inmates Roede released were not authorized to be on the yard or that the inmates Roede released started the riot or kept TSCI staff from preventing a riot. Roede's conduct in

---

[8] Rempel's testimony at a prior trial that, when she used to work in TSCI's control center, the control centers had a list of inmates who were authorized to leave for medical lines, Filing 151-2 at 327, is not evidence that TSCI policy required Roede to individually screen each inmate. Furthermore, even if TSCI had such a policy, violating a prison policy does not automatically constitute deliberate indifference. See Luckert v. Dodge Cnty., 684 F.3d 808, 819 (8th Cir. 2012) ("Failure to follow written procedures does not constitute per se deliberate indifference. If this were so, such a rule would create incentive for jails to keep their policies vague, or not formalize policies at all.").

releasing inmates to report to the medical lines does not exhibit deliberate indifference, which "requires a highly culpable state of mind approaching actual intent." *Blair*, 929 F.3d at 988 (8th Cir. 2019) (quoting *Kulkay*, 847 F.3d at 643). Accordingly, Roede's conduct does not support Plaintiff's failure-to-protect claim against him, and he is entitled to summary judgment.

Finally, Plaintiff's brief opposing summary judgment is devoid of any argument concerning her claims against Glass and Steele, two of the caseworkers in Galleries A and B. The only evidence of Glass's activity that Plaintiff references in her brief is that she responded to Rempel's call for assistance in the yard. Filing 153 at 21–22; *see Haggenmiller*, 837 F.3d at 884 ("[A] nonmovant . . . must . . . set forth specific facts sufficient to raise a genuine issue for trial. (quoting *Gibson*, 670 F.3d at 853); Fed. R. Civ. P. 56(c)(3) (stating that, when ruling on a summary judgment motion, "[t]he court need consider only the cited materials . . . ."). The Court cannot think of a way in which this conduct supports Plaintiff's failure-to-protect claim. As to Plaintiff's claim against Steele, the Court generously assumes Plaintiff faults Steele for failing to establish control over the inmates rioting in Gallery A and later evacuating to the control center for Galleries C and D. Plaintiff does not explain, however, how Steele should have stopped the inmates, who were armed, smashing a hole in the wall, covering the control center windows with sheets, and starting fires. *See Z.J. by & through Jones*, 931 F.3d at 688 (noting that there must be a causal link between a defendant's actions and the deprivation of rights to establish liability under § 1983). Because nothing in the record hints at how Steele could have established control over the inmates in Gallery A, the Court finds that no reasonable jury could find that Steele's failure to do so was deliberately indifferent. Moreover, Steele evacuating the control center for Galleries A and B after receiving permission from his superior was not deliberately indifferent. Gallery A was overrun with rioting and armed inmates, and smoke was filling the control center. Steele only has a

generalized duty to protect prisoners by "'tak[ing] reasonable measures to guarantee' inmate safety," *Nelson*, 603 F.3d at 446 (quoting *Young*, 508 F.3d 871–72), not to put himself in harm's way in a futile attempt to stop a riot. From the evidence in the record, no reasonable jury could find that Steele acted with deliberate indifference. Steele is entitled to summary judgment.

### D.  The Claim Against Sabatka-Rine

It is unclear to the Court why Sabatka-Rine is a defendant in this suit. The only time Plaintiff's Amended Complaint mentions Sabatka-Rine is when it states that she "was the Deputy Director of Institutions and is now the Chief of Operations" and that she "is sued in her individual capacity." Filing 98 at 3. Sabatka-Rine has filed an affidavit explaining that she was not present at TSCI on the date of the riot and has moved for summary judgment on that basis. Filing 148-16 at 1.

Now, in her Brief in Opposition, Plaintiff attempts to salvage her claim against Sabatka-Rine by arguing, with no evidence in support, that Sabatka-Rine "surely was aware" about supposed staffing issues at TSCI, "knew or should have known" about alleged inmate-capacity concerns, and "elected not to respond to the emergency in any way." Plaintiff offers no evidence showing that Sabatka-Rine knew anything about these supposed issues. *Dryer*, 814 F.3d at 942. No reasonable jury could find that Sabatka-Rine, who was not even at TSCI on the day of the riot, was deliberately indifferent to a substantial risk of serious harm to Plaintiff. Sabatka-Rine is entitled to summary judgment.[9]

---

[9] Plaintiff also highlights that defendant Frakes learned about the riot at TSCI from someone he believed to be Sabatka-Rine. Filing 153 at 56. The relevance of this information is unclear to the Court and seems contrary to Plaintiff's evidence-free assertion that Sabatka-Rine did not respond to the riot "in any way."

### E.  The Claim Against Ulrick and Gage

In her failure-to-protect claim against Ulrick, the acting Lieutenant and the Initial Incident Commander, and Gage, the warden at TSCI, Plaintiff contends Ulrick and Gage operated TSCI without proper staffing, including on the day of the riot, and failed to respond appropriately to the prison riot. Filing 98 at 6, 10–11. Defendants respond that TSCI met its minimum staffing requirements on the day of the riot and that Gage and Ulrick reacted to the riot appropriately. Filing 147 at 27–29, 31–35.

#### 1.  Plaintiff's Claim Related to Understaffing

The Court first addresses Plaintiff's argument that Gage and Ulrick failed to ensure TSCI had proper staff.[10] To reiterate, to establish a failure-to-protect claim, Plaintiff must show that Gage and Ulrick were "deliberately indifferent to the need to protect [Plaintiff] from a substantial risk of serious harm from other inmates.'" *Vandevender*, 970 F.3d at 975 (quoting *Jackson*, 140 F.3d at 1151). In support of her claim, Plaintiff emphasizes that, in a past trial, Gage acknowledged that TSCI had staffing concerns, including difficulty retaining staff, and that the post-riot incident report noted that TSCI staff had high turnover and low morale. Filing 153 at 62–64. Plaintiff also points to a staff grievance, written 11 years before the riot, in which several TSCI staff expressed displeasure about their working conditions, Filing 152-4 at 1–5.

First, although Gage and Ulrick have not argued that Plaintiff fails to show that she faced a substantial risk of serious harm, the Court harbors doubts that Plaintiff has made such a showing. *See Berry v. Sherman*, 365 F.3d 631, 634 (8th Cir. 2004) (holding that to meet the objective prong of the failure-to-protect inquiry, a plaintiff must show that she faced "a substantial or pervasive

---

[10] It is unclear to the Court whether Plaintiff is contending that Ulrick is liable for failing to address staffing concerns at TSCI. Her Amended Complaint appears to make this claim, but it is absent from her brief opposing summary judgment. In the interest of completeness, the Court will address whether there is sufficient evidence from which a jury could find Ulrick was deliberately indifferent to the staffing issues at TSCI.

risk of harm"). There is nothing in the record showing that the staffing concerns at TSCI subjected Plaintiff to a substantial risk of serious harm. As the Eighth Circuit Court of Appeals in *Vandevender v. Sass* explained, while "a single incident or isolated incidents" of inmate-on-inmate assault is insufficient to show a substantial risk of serious harm, "it is enough that violence and sexual assaults occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures." *Vandevender*, 970 F.3d at 977 (quoting *Andrews v. Siegel*, 929 F.2d 1326, 1330 (8th Cir. 1991)); *see also Falls v. Nesbitt*, 966 F.2d 375, 378 (8th Cir. 1992) ("In every case, a 'pervasive risk' is something more than a single incident and something less than a riot."). Under Eighth Circuit Court of Appeals caselaw, far more is required than vague references to staffing issues at a prison to show a substantial risk of serious harm. Plaintiff has provided no evidence concerning the frequency of assaults at TSCI, that TSCI staff had been unable to protect inmates in the past, or whether the staffing issues at TSCI had any effect on the danger inmates posed to each other. *See Alexander v. Goforth*, No. 421CV00454LPRERE, 2021 WL 5177404, at *3 (E.D. Ark. Oct. 4, 2021) (concluding that vague references to a history of inmate violence were insufficient to show that the plaintiff "faced a pervasive risk of harm"), *report and recommendation adopted*, No. 421CV00454LPRERE, 2021 WL 5173232 (E.D. Ark. Nov. 4, 2021); *Beaton v. Tennis*, 460 F. App'x 111, 114–15 (3d Cir. 2012) (holding that a failure-to-protect claim failed when an inmate attacked the plaintiff with a padlock, which the prison provided in its commissary, and the record showed that padlock assaults occurred once or twice each year). She has therefore failed to present sufficient evidence from which a reasonable jury could find that she was exposed to a substantial risk of serious harm.

In any event, assuming that Plaintiff had evidence that the staffing issues at TSCI posed a substantial risk of serious harm to her, Plaintiff has failed to offer sufficient proof from which a reasonable jury could find that Gage or Ulrick were deliberately indifferent. Gage merely acknowledging that TSCI had staffing issues does not constitute deliberate indifference. *See Fields v. Abbott*, 652 F.3d 886, 893 (8th Cir. 2011) (holding that the defendant's acknowledgement that a jail needed more jailers did not show deliberate indifference). Deliberate indifference requires that the defendant knew of the substantial risk of serious harm or that the risk was so obvious that a jury may infer that the defendant knew the risk existed. *Blair*, 929 F.3d at 987. Negligence, even gross negligence, is insufficient; the defendant must act or fail to act with conscious disregard of the risk. *Id.* at 987–88.

Here, Plaintiff has not pointed to anything in the record showing that Gage or Ulrick were aware of a substantial risk of serious harm to Plaintiff caused by TSCI's staffing issues, or that the risk posed by the staffing issues was obvious enough to support an inference that they knew the risk existed. Indeed, Plaintiff provides no evidence that Ulrick, a shift supervisor at TSCI, had any control over staffing at TSCI. *See Marsh v. Phelps Cnty.*, 902 F.3d 745, 754 (8th Cir. 2018) (holding that, to establish personal liability for the violation of a constitutional right, a plaintiff must "allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [the plaintiff's] constitutional rights" (quoting *Mayorga*, 442 F.3d at 1132)); *see also Crow v. Montgomery*, 403 F.3d 598, 603 (8th Cir. 2005) (noting that the defendants only had "partial control" over the institution-wide deficiencies that purportedly contributed to the attack on plaintiff from his fellow detainees) (overruled in part on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009)). As to Gage, at most the evidence shows that he may have acted unreasonably in not doing more to alleviate the staffing issues at TSCI, which included a high turnover rate and low

morale, but unreasonableness is insufficient as a matter of law to constitute deliberate indifference. *See Moser v. Frakes*, No. 8:18CV551, 2019 WL 3219463, at *4 (D. Neb. July 17, 2019) (finding, in a case involving the same riot at TSCI as this case, that allegations that the defendant's "knew TSCI was at 107% of its designed capacity and . . . that they knew the facility was generally understaffed and overused restrictive housing" did not rise to the level of deliberate indifference).

The Court next turns to Plaintiff's argument that Gage and Ulrick were deliberately indifferent by not ensuring that TSCI was properly staffed on the day of the riot. The initial flaw in Plaintiff's argument is that she lacks any evidence that TSCI was understaffed. Based on the record before the Court, ordinarily the minimum staffing requirement at TSCI is 61 staff members, but because two areas of the prison were closed on May 10, the required number of staff dropped to 57, which was the number of staff members at TSCI on May 10. Filing 148-10 at 3; Filing 148-11 at 2. Plaintiff does not dispute that the minimum level of staff was present at TSCI, but instead attempts to show that two Unit Case managers and two Caseworkers were absent from Housing Unit 2. In support, Plaintiff points out that TSCI's post order provide that Housing Unit 2 "maintains" a certain number of staff, and that the number of staff listed in the post orders does not match the number of staff shown in the May 10 work roster. Filing 151-6 at 1; Filing 152-7 at 5.

Plaintiff's reliance on the post orders is misplaced. TSCI's post orders say nothing about the specific levels of staff that must be present at any given time. The uncontroverted record shows that TSCI had the minimum number of staff on May 10. Plaintiff has therefore failed to create any genuine dispute about understaffing at TSCI on the day of the riot. *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020) ("[T]he non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment.").

Nevertheless, even assuming that there was a genuine dispute, Plaintiff has failed to show that Gage or Ulrick were deliberately indifferent. As to Gage, Plaintiff provides no evidence that Gage was aware of the staffing levels at TSCI on the day of the riot. *See Vandevender*, 970 F.3d at 975–76 ("To be liable, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" (quoting *Farmer*, 511 U.S. at 837). In fact, Gage was not at TSCI on May 10 until after the riot occurred.

As to Ulrick, although his position as shift manager on May 10 could provide some basis to believe he knew about the number of staff at TSCI on May 10, this awareness does not establish deliberate indifference. There is nothing in the record showing that Ulrick believed that four missing staff members could risk inmates rioting or that such a risk is obvious enough that it may be inferred that he believed four missing staff members posed a substantial risk. *Blair*, 929 F.3d at 987–88 (noting that a plaintiff can show deliberate indifference if the defendant had actual knowledge of a substantial risk of serious harm or that "the risk was obvious enough to support the inference that [the defendant] knew the risk existed"). Plaintiff has failed to show that the absence of four staff members, when 57 were already present at TSCI, created such an obvious substantial risk that inmates would riot and assault Plaintiff that Ulrick acted with deliberate indifference. While not taking corrective action to account for four missing staff members, at most, may support a finding of negligence, negligence is not equivalent to deliberate indifference. *Id.* at 988 ("[N]either unsupported conjecture nor negligence regarding a substantial risk of serious harm . . . is sufficient to prove deliberate indifference." (alterations in original) (quoting *Lenz v. Wade*, 490 F.3d 991, 996 (8th Cir. 2007))). On these facts, a reasonable jury could not find that Ulrick was deliberately indifferent.

The Eighth Circuit Court of Appeals case *Crow v. Montgomery* is instructive on the issue of whether Ulrick or Gage was deliberately indifferent to a substantial risk of harm to Plaintiff. Similar to the case at hand, the plaintiff in *Crow* alleged that the defendants acted with deliberate indifference by operating an overcrowded detention center with "insufficient staff who were inadequately trained and supervised" when a fellow detainee punched the plaintiff. *Crow*, 403 F.3d at 600. The Eighth Circuit Court of Appeals held, "At most, [the plaintiff's] allegations show that the [detention center's] officials may have acted unreasonably in failing to take particular measures to improve the conditions at the facility, but that does not rise to the level of deliberate indifference." *Id.* at 602. The court elaborated, "Even if [the defendants] were unreasonable, and might have done various things to prevent the blow Crow endured, 'reasonableness is a negligence standard' and negligence cannot give rise to an Eighth Amendment failure-to-protect claim." *Id.* (quoting *Jackson*, 140 F.3d at 1152).

In this case, the record shows that the conditions at TSCI were nothing close to the severity of the conditions alleged in *Crow*. Based on the evidence in this case, no reasonable jury could find that Gage and Ulrick were deliberately indifferent about the staffing levels at TSCI.

### 2. *Plaintiff's Claim Related to the Response to the Riot*

The Court turns to Plaintiff's claim that Ulrick and Gage failed to protect her in the way they responded to the riot. As to Ulrick, Plaintiff argues that Ulrick "never attempted to evacuate the inmates despite having an evacuation plan" and "instead . . . released the locked down inmates into the area where the riotous behavior was occurring." Filing 153 at 67. The "evacuation plan" that Plaintiff refers to consists of TSCI's post orders providing instructions for evacuating "due to a fire or other condition." Filing 152-7 at 41–43. In response, Defendants argue that ordinary evacuation procedures were impossible during the current riot. Filing 147 at 29–31; Filing 159 at

31–32. Defendants further contend that Ulrick responded appropriately to the riot by allowing staff to evacuate Galleries A and B and opening the cell doors to allow inmates in Galleries A and B to escape to the miniyard to avoid the smoke and fire. Filing 147 at 29–31.

The fact that Ulrick and Gage were responding to a prison riot changes the applicable legal standard on Plaintiff's failure-to-protect claim against them. The Supreme Court has held that an Eighth Amendment violation requires "wanton" conduct. *See Wilson*, 501 U.S. at 302 ("[O]ur cases say that the offending conduct must be *wanton*.") (emphasis in the original). "[W]antonness does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). "In cases involving prison riots . . . wantonness is demonstrated by acting 'maliciously and sadistically for the very purpose of causing harm.'" *Nelson*, 583 F.3d at 528 (quoting *Whitley*, 475 U.S. at 320–21).

The Supreme Court has instructed courts to be reluctant to second-guess the decisions of prison officials responding to riotous inmates. "When the ever-present potential for violent confrontation and conflagration ripens into actual unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight." *Whitley*, 475 U.S. at 321 (cleaned up). In these situations, courts should extend "wide-ranging deference" to prison officials. *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)). Thus, while "actions taken in bad faith and for no legitimate purpose" are not insulated from review, judges and juries should not "freely substitute their judgment for that of officials who have made a considered choice." *Id.*

No reasonable jury could conclude that Ulrick acted "maliciously and sadistically for the very purpose of causing harm." *Nelson*, 583 F.3d at 528 (quoting *Whitley*, 475 U.S. at 320–21).

As Defendant's correctly note, the record provides no basis to conclude that the rioting inmates in Gallery A could have been evacuated according to TSCI's ordinary procedures. Moreover, nothing supports the conclusion that Ulrick authorized TSCI's staff to evacuate Galleries A and B—when prisoners were actively rioting in Gallery A and attempting to breach the wall into Gallery B—with an improper motive. TSCI staff had signaled that they were under duress from the rioting inmates and the fire, and Ulrick allowed them to evacuate.

Furthermore, Plaintiff's argument that Ulrick "released the locked down inmates into the area where the riotous behavior was occurring" does not support a finding of a malicious motive. First, it is unclear to the Court why Plaintiff believes this argument advances her claim. Plaintiff herself was not released into "the area where the riotous behavior was occurring." Plaintiff was in Gallery A, which was never locked down and was where inmates were already rioting. The releasing of locked down inmates did not expose Plaintiff to any further risk of harm. Second, Ulrick released inmates because of the active fire and after hearing reports about smoke filling TSCI's galleries. Releasing inmates to allow them to escape, rather than subjecting them to a fire and suffocating smoke with no ability to evacuate, was obviously appropriate. *See Guerry v. Frakes*, No. 4:17CV3047, 2018 WL 1702391, at *11 (D. Neb. Apr. 6, 2018) (concluding, in a case involving the same riot at TSCI as this case, that TSCI staff were not deliberately indifferent for releasing protective custody inmates into the same area as general population inmates to avoid a prison fire because "the concern for acute inmate injury from the smoke and fires took precedence over the potential problem of mixing general population and protective custody inmates"), *aff'd*, 748 F. App'x 719 (8th Cir. 2019).

To the extent Plaintiff argues that Ulrick's other actions support her failure-to-protect claim, the Court concludes that Plaintiff has offered insufficient evidence from which a reasonable

jury could find Ulrick liable. The record shows that Ulrick immediately contacted CERT and SORT in response to the riot and, once they arrived, ordered the rescue of prison staff barricaded in different locations around TSCI. The Plaintiff points to no evidence that these actions were taken "in bad faith and for no legitimate purpose." *Whitley*, 475 U.S. at 321. Moreover, while Plaintiff suggests that Ulrick should have regained control of TSCI sooner, she fails to explain or offer any evidence showing what Ulrick should have done.[11] Based on the record, a reasonable jury could not find that Ulrick acted maliciously or sadistically for the purpose of harming Plaintiff.

Turning to the way Gage responded to the riot, the record shows that Gage received a call from Ulrick about the ongoing riot, arrived at TSCI sometime around 5:15 p.m., and at around 8:20 p.m. took control of the response to the riot. Although Plaintiff seems to fault Gage for not immediately taking control of the response to the riot from Ulrick, delaying the transfer of control over the response to a riot is consistent with TSCI policy. *See* Filing 157-2 at 8. Nor is there any evidence that Ulrick was responding so inappropriately to the riot that Gage's failure to take control shows he acted with a malicious or sadistic motive. *Nelson*, 583 F.3d at 528.

Plaintiff has not offered sufficient evidence from which a reasonable jury could find in her favor on her failure to protect claim against Ulrick and Gage. Therefore, Ulrick and Gage are entitled to summary judgment. *See Torgerson*, 643 F.3d at 1042 ("Where the record taken as a

---

[11] Plaintiff states that she was not evacuated until 8:00 a.m. the day after the riot. Filing 153 at 68. However, Plaintiff has offered no evidence to support this contention. Rather, the record shows that CERT, SORT, and TSCI staff regained control over TSCI sometime between midnight and 1:00 a.m. on May 11. Filing 151-2 293 (Defendant Frakes testifying that "around midnight" prison staff had regained control of TSCI); Filing 151-5 at 11, 16 (post-incident report stating that prison staff regained control of TSCI at 1:00 a.m.). Because Plaintiff cites no facts in support of her contention—which is also contradicted by the record—her assertion that she was not evacuated until 8:00 a.m. does not create a genuine dispute of fact. *See Turner v. XTO Energy, Inc.*, 989 F.3d 625, 628 (8th Cir. 2021) (holding that while "the facts and the inferences to be drawn from them [must be] in the light most favorable to" the nonmoving party, those facts "must be properly supported by the record." (quoting *P.H. v. Sch. Dist. of Kansas City, Mo.*, 265 F.3d 653, 656–57 (8th Cir. 2001))); *Michael v. Trevena*, 899 F.3d 528, 532 (8th Cir. 2018) ("[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." (quoting *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009))).

### F.  Claim Against Frakes in his Individual Capacity

Finally, the Court addresses Plaintiff's failure-to-protect claim against Frakes, the Director of the Nebraska Department of Correctional Services, in his individual capacity. Although Plaintiff's argument is difficult to follow, it appears that Plaintiff contends that Frakes failed to properly supervise unnamed subordinate employees and failed to alleviate staffing issues at TSCI. Filing 153 at 57–62. Plaintiff also takes issue with the fact that she was classified at a high risk for victimization, yet was placed in TSCI, which houses medium-security, maximum-security, and death-row inmates. Filing 153 at 57–62.

First, for the same reason that Gage was not deliberately indifferent to the staffing issues at TSCI, the evidence is likewise insufficient for a reasonable jury to find that Frakes was deliberately indifferent. Second, while Plaintiff asserts that Frakes failed to properly supervise subordinate employees, Plaintiff has not explained who these unknown subordinate employees are and how they violated her rights. *See Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) ("[A] general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability."); *see also Marsh*, 902 F.3d at 754 ("[A] supervisor's failure to train an inferior officer may subject the supervisor to liability in his individual capacity only 'where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact'" (second alteration in original) (quoting *Schaffer v. Beringer*, 842 F.3d 585, 596 (8th Cir. 2016))).

Lastly, the sole fact that Plaintiff was placed at TSCI does not establish a constitutional violation. Plaintiff does not explain why her classification as an inmate with a high risk of

victimization, in and of itself, made her placement at TSCI improper. *Cf. Davis v. Scott*, 94 F.3d 444, 447 (8th Cir. 1996) (holding that the plaintiff expressing fear that someone in the prison's general population would attack him and his "vague and unsubstantiated" statements that he had enemies in the general population did not make his placement in general population deliberately indifferent). Nor is there any evidence that Plaintiff ever expressed being in fear of her safety prior to the riot. *See Berry*, 365 F.3d at 634 (noting that the undisputed evidence indicated that the plaintiff did not believe he was at a substantial risk of serious harm); *Falls*, 966 F.2d at 378 (observing that the plaintiff testified that, before he was attacked, he had no reason to believe that his cellmate would try to kill him). Plaintiff's placement at TSCI, despite her being at high risk of victimization, does not show that Frakes was deliberately indifferent to a substantial risk of serious harm to her. *Cf. Blair*, 929 F.3d at 988 ("A prison official does not necessarily act with deliberate indifference by failing to place an inmate 'in protective custody based on his general fear for his safety.'" (quoting *Robinson v. Cavanaugh*, 20 F.3d 892, 895 (8th Cir. 1994))); *Falls*, 966 F.2d at 379–80 (rejecting argument that requiring a protective-custody inmate to share a cell with a general-population inmate is a per se violation of the Eighth Amendment). Plaintiff has failed to offer evidence sufficient for a reasonable jury to find that Frakes was deliberately indifferent to a substantial risk of serious harm to her. Accordingly, Frakes is entitled to summary judgment.

### IV.   CONCLUSION

The Court concludes that Defendants are entitled to summary judgment. Accordingly,

IT IS ORDERED:

1.  Defendants' Motion for Summary Judgment, Filing 146, is granted;

2.  Defendants' Motion in Limine, Filing 163, is denied as moot;

3.  Plaintiff's Motion to Strike, Filing 176, is denied as moot;

4.  Plaintiff's Amended Complaint, Filing 98, is dismissed; and

5.  The Court will enter a separate judgment.

Dated this 25th day of May, 2022.

BY THE COURT:

Brian C. Buescher
United States District Judge